UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| U.S. Well Services, LLC, | |
| Plaintiff, | Case No. 4:21-cv-3441 |
| v. | |
| VoltaGrid LLC, Nathan Ough, Certarus (USA) Ltd., and Jared Oehring, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Plaintiff U.S. Well Services, LLC ("USWS") files this Complaint against Defendants VoltaGrid LLC ("VoltaGrid"), Nathan Ough ("Ough"), Certarus (USA) Ltd. ("Certarus"), and Jared Oehring ("Oehring") (collectively, "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.      USWS brings this lawsuit for injunctive relief and for damages it has suffered and continues to suffer as a result of wrongful conduct by its former Vice President and Chief Technical Officer, Jared Oehring; Certarus (USA) Ltd.; its co-founder and (former) Vice President, Nathan Ough; and VoltaGrid.   Together, Defendants engaged in the intentional and deliberate misappropriation of USWS's trade secrets and other confidential information relating to USWS's electric hydraulic fracturing technology to form a competing startup company that later became known as VoltaGrid.  Today, VoltaGrid operates in direct competition with USWS in the electric hydraulic fracturing industry, and its products are a direct result of the trade secret and confidential information collectively and individually misappropriated by Oehring, Ough, and Certarus.

2.      As set forth below, in connection with a mutual confidentiality agreement signed between USWS and Certarus, Certarus acquired confidential and proprietary information to

complete its obligations to deliver compressed natural gas ("CNG") as one of USWS's vendors in the hydraulic fracturing industry.  Exceeding the bounds of that confidentiality agreement, Certarus' then-Vice President, Nathan Ough, improperly accessed said confidential and proprietary information to begin developing a power generation company to compete with USWS. To complete his business plan, Ough enlisted and induced USWS's then-Chief Technology Officer ("CTO"), Jared Oehring, to provide him with additional USWS confidential and proprietary information relating to the inner workings of USWS's proprietary and confidential Clean Fleet® technology.

3.      Together, the two developed a startup power generation company, which would come to be known as VoltaGrid, to compete with USWS.  While acting as USWS's CTO, Oehring continued to provide confidential and proprietary information belonging to USWS to Ough for use in the development of VoltaGrid.  Ough began to pitch VoltaGrid to investors such as Halliburton, Walter Ventures, Certarus, and surprisingly, USWS's customers.  During said development, Oehring used the access and know-how gained while managing, developing, and deploying USWS's proprietary Clean Fleet® systems and technologies to help Ough develop competing products and services for VoltaGrid.

4.      Within weeks of Oehring's pitch to USWS's own customers, USWS discovered that Oehring had been breaching his duties as an executive at USWS by having interests in business ventures outside of USWS.  Such actions constituted a breach of Oehring's employment agreement, and resulted in Oehring's resignation and separation from USWS.  However, Oehring represented to USWS that VoltaGrid (then referred to as NexGrid Technologies LLC) was a power generation company that would not and did not compete with USWS.  Given the purported non-competitive nature of VoltaGrid, and USWS's lack of knowledge that VoltaGrid was developed

2

with USWS's confidential and proprietary information misappropriated by Ough and Oehring, USWS allowed Oehring to join VoltaGrid upon his resignation and exempted VoltaGrid from any non-compete covenant in Oehring's separation agreement with USWS.

5.      Accordingly, Oehring joined VoltaGrid as its Chief Technology Officer immediately after his departure from USWS, taking with him his knowledge and understanding of USWS's Clean Fleet® technologies, and the technical and business know-how necessary to provide VoltaGrid with a significant head start in developing competing products and services in the electric hydraulic fracturing industry.

6.      As set forth below, such products and services were unquestionably developed with USWS's trade secret and confidential information that Oehring: (i) misappropriated to Ough during his employment at USWS, and/or (ii) improperly took with him upon his resignation from USWS.  Additionally, to further aid in the development of VoltaGrid's electric hydraulic fracturing products and services in direct competition with USWS, VoltaGrid, on information and belief, purchased, from Certarus, the business model/plan of VoltaGrid (that necessarily incorporates USWS's confidential and proprietary information provided by Certarus, Ough, and Oehring) for $25,000.00.   Such sale of information was not authorized under the terms of the Mutual Confidential Agreement ("MCA"), nor was USWS notified of any such sale, nor did USWS have any idea that such business plan was created with its own confidential and proprietary information. Such information, which, until Defendants' misappropriation, was confidential and proprietary in nature, and improperly provided VoltaGrid with a head start in developing a competing electric hydraulic fracturing company in the industry.

7.      Today, VoltaGrid develops, sells, and operates technologies including modular natural gas generators, energy storage systems, electric switchgears systems used in electric

hydraulic fracturing, which were all developed and deployed by Oehring and Ough using the trade secret and other confidential information from USWS. USWS therefore brings this suit to recover actual and punitive damages, including its attorney fees stemming from Defendants' misappropriation and breach of contractual obligations, and to obtain an injunction preventing Defendants' continued use of USWS's trade secret and other confidential information improperly used by Defendants to USWS's detriment.

## PARTIES

8.      Plaintiff U.S. Well Services, LLC is a Delaware limited liability company having its principal place of business at 1360 Post Oak Boulevard, Suite 1800, Houston, Texas 77056. USWS is a wholly-owned subsidiary of U.S. Well Services, Inc.

9.      Defendant VoltaGrid LLC is a limited liability company organized under the laws of the State of Texas with its principal place of business at 917 Mulberry Lane, Bellaire, Texas 77401. VoltaGrid may be served with process upon its registered agent, Randolph Ewing, at 6363 Woodway, Suite 1000, Houston, Texas 77057.

10.     Defendant Nathan Ough is an individual citizen of the State of Texas who may be served with process at his residence at 917 Mulberry Lane, Bellaire, Texas, 77401, or wherever he may be found.

11.     Defendant Certarus (USA) Ltd. is a foreign for-profit corporation organized under the laws of Delaware with its principal place of business at 750 Town and Country Boulevard, Suite 175, Houston, Texas 77024. Certarus may be served by service of process upon its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

12.    Defendant Jared Oehring is an individual citizen of the State of Texas who may be served with process at his residence at 14310 Saint Pierre Ln, Cypress, Texas 77429, or wherever he may be found.

## JURISDICTION AND VENUE

13.    This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because USWS asserts claims that arise under the laws of the United States, namely, the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq*.

14.    The Court has personal jurisdiction over all Defendants because Defendants' wrongful actions caused harm to USWS in this state and in Harris County, Texas.

15.    Additionally, the Court has personal jurisdiction over Defendant VoltaGrid because Defendant VoltaGrid is licensed to do business in the State of Texas and conducts substantial business within the State of Texas and, specifically, within the Southern District of Texas ("this Judicial District").

16.    The Court has further personal jurisdiction over Defendant Nathan Ough, because Defendant Ough is, at least, a resident of this Judicial District and committed acts giving rise to this action within this Judicial District.

17.    The Court has further personal jurisdiction over Defendant Certarus because Defendant Certarus is licensed to do business in the State of Texas and conducts substantial business within the State of Texas and, specifically, within this Judicial District.

18.    The Court has further personal jurisdiction over Defendant Jared Oehring because Defendant Oehring is at least a resident of this Judicial District and has committed acts giving rise to this action within this Judicial District.

19.     Venue is proper against Defendants in this District under 28 U.S.C. § 1391(b) at least because: (i) a substantial part of the events or omissions giving rise to USWS's claims occurred in Harris County, and (ii) all of the Defendants, in fact, reside in this Judicial District. The facts further show that the convenience of the parties and the witnesses and the interests of justice would be best served in this Judicial District.

**FACTUAL BACKGROUND**

**A.      U.S. Well Services Develops its Pioneering Clean Fleet® Technology**

20.     USWS was founded in February 2012, by current CEO Joel Broussard, and provides services at well sites to exploration and production companies, including hydraulic fracturing (sometimes "fracking") services.  As a hydraulic fracking service provider, USWS designs, builds, operates and maintains fracturing "fleets," which may be deployed to well sites to operate in the extraction of oil and gas from an underground formation.

21.     Traditionally, hydraulic fracturing fleets, including the systems and subsystems that operate to fracture an underground formation, have operated on diesel fuel.

22.     In 2013, USWS set out to develop the industry's first all-electric well stimulation and fracking system in the industry, which, at that point in time, was unproven technology.  USWS invested millions of dollar in developing its all-electric well stimulation and fracking system, which became known as the Clean Fleet® technology.  In July 2014, USWS successfully deployed the Clean Fleet® technology, the first all-electric well stimulation system in the fracking industry.  USWS earned public acclaim for this breakthrough, including a New Technology Development Award at the Annual Oil & Gas Awards in March 2015.

23.     USWS expended significant investments to develop and commercialize the Clean Fleet® electric fracturing technology.  USWS's investments included research and development,

testing, and implementation of its confidential and proprietary electric fracturing technology at the appropriate quality and scale. As part of its successful growth, USWS has developed, and continues to develop, this confidential and proprietary business information and intellectual property that, among other things, includes a robust patent portfolio, dozens of pending patent applications, and trade secret and other confidential information regarding the design and implementation of its Clean Fleet® technologies. USWS employs a number of innovators and inventors in the electric hydraulic fracturing field, including its CEO Joel Broussard, who appear as the named inventors on USWS's issued patents covering its Clean Fleet® technologies.

24.     Today, USWS operates as one of the few electric hydraulic fracturing completion service providers in the industry and is in the process of becoming the first publicly traded, fully-electric completion service provider in the industry. USWS currently maintains and operates five all-electric completion fleets, and expects to grow to nine electric fleets by the end of 2022.

25.     In addition to its robust patent portfolio covering various elements and features of its all-electric, Clean Fleet® technology, USWS vigorously protects its trade secret and other confidential information through various means. For instance, USWS's data, including its confidential and proprietary business information, is maintained on a secure computer system that has restricted access with security passwords that employees must use to log onto their computers. Furthermore, USWS restricts employee access to the confidential and proprietary business information.

26.     In addition, when new employees are hired, they are required to review and acknowledge USWS's policies regarding confidentiality and the importance of USWS's confidential and proprietary information. Such policies require employees who receive or have

access to confidential information to keep such information confidential, and refrain from disclosing such information, unless and until it is released to the public through approved channels.

27.    Moreover, USWS includes robust confidentiality provisions in its employment agreements with its employees and executives, which, for example, lay out specific procedures for handling, using and/or disclosing confidential information belonging to USWS during the ordinary course of an employee's duties and roles, if applicable.  USWS also maintains general policies restricting the disclosure, misuse, and post-termination retention of its confidential information.

## B.    USWS Hires Defendant Jared Oehring

28.    In August 2014, USWS hired Defendant Jared Oehring as its Director of Technology.  At the time of his hiring, Oehring was well versed in fracking operations, prior to his employment with USWS, Oehring had worked as an Engineering Manager for Stewart & Stevenson, a prominent Houston-based manufacturer and distributor of engineering systems used, in the oil and gas and power generation industries, where he developed engineering designs for USWS as Stewart & Stevenson's customer

29.    As the Director of Technology, Oehring was responsible for project management and supply chain management for USWS's traditional and all-electric hydraulic fracturing fleets. Moreover, as the Director of Technology, Oehring helped manage the deployment of USWS's first set of Clean Fleet® systems in 2014 and 2015.

30.    During the early development of USWS's Clean Fleet®, Oehring, along with several other USWS employees, filed several patent applications claiming inventions specifically designed for electric hydraulic fracturing systems and operations, including systems and apparatus for future Clean Fleet® technologies.  In connection with the development and filing of the patent applications covering the Clean Fleet® technologies, as well as his general role as the Director of

Technology, Oehring had access to and developed confidential and proprietary information regarding said systems, including, for example, the technical information, inventions, discoveries, designs, processes, and research regarding the operations of USWS and its products. Furthermore, in accordance with his original employment agreement with USWS, Oehring acknowledged and agreed that said information, including any invention or idea conceived by Oehring was the property of USWS.

31.     From deployment of the first Clean Fleet® technologies in 2014 to 2017, Oehring, along with several other USWS inventors and innovators, continued to develop, invent, and implement designs and systems into USWS's hydraulic fracturing fleets, including its award-winning Clean Fleet® technologies. Based on Oehring's partial contributions to USWS's growth as an industry leader in the field of electric hydraulic fracturing, Oehring was promoted to Vice President ("VP") of Technology on or around May 31, 2017.

32.     As a condition of his promotion to VP of Technology, Oehring and USWS entered into an Employment Agreement ("2017 Employment Agreement") with USWS. *See* Exhibit A, 2017 Employment Agreement.

33.     In the 2017 Employment Agreement, Oehring agreed and acknowledged that he would "be making use of, acquiring, or adding to [USWS's] confidential information (the "Confidential Information"). *Id*. § 6.02 (emphasis in original). The 2017 Employment Agreement defined the "Confidential Information" as including, but not limited to "memoranda and other materials or records of a proprietary nature; technical information regarding the operations of [USWS]; and records and policy matters relating to finance, personnel, market research, strategic planning, current and potential customers, lease arrangements, service contracts, management and operations." *Id*. Oehring further acknowledged and agreed that "to protect [USWS's] Confidential

Information" he "would not in any way use any of said Confidential Information except in connection with his employment by [USWS], and except in connection with the business of [USWS] he will not copy, reproduce, or take with him the original or any copies of said Confidential Information and will not directly or indirectly divulge any of said Confidential Information to anyone without prior written consent of [USWS]." *Id.*

34.    Oehring further agreed that all "Inventions"[1] he conceived or created during his employment with USWS would become and are the sole property of USWS and that he was under the obligation to immediately disclose all Inventions to USWS. *Id.* Oehring further acknowledged and agreed that such obligations "continue beyond the termination of [Oehring's] employment with respect to Inventions conceived, developed, or made" during his employment at USWS. *Id.*

35.    As the VP of Technology, Oehring continued in his responsibilities for managing and directing the development, creation, and deployment of USWS's Clean Fleet® technologies. These responsibilities specifically included managing the supply chain for the procurement of materials and components for USWS's Clean Fleet® technologies, as well as managing operations where USWS's Clean Fleet® technologies were being used in the field. Additionally, Oehring continued to develop valuable inventions and confidential and proprietary information regarding USWS's Clean Fleet®. From the time of Oehring's promotion to VP of Technology in 2017 to 2019, USWS was issued a number of patents relating to electric hydraulic fracturing systems and

---

[1] Section § 6.03 of the 2017 Employment Agreement defines "Inventions" as: "[a]ll writings, works of authorship, technology, inventions, discoveries, designs, improvements, processes, techniques, methods, ideas, concepts, research, proposals, materials, and all other work product of any nature whatsoever, whether patentable or not, relating to (or suggested by or resulting from) any business, products, services, research, technology or development of [USWS] or relating to (or suggested by or resulting from) methods or processes used or usable in connection with the business of [USWS] that may be conceived, developed, or contributed by [Oehring] during[his] employment with [USWS] (hereinafter "Inventions"), either solely or jointly with others…."

processes.  Additionally, Oehring developed non-patentable information, such as the technical designs and operations of USWS's Clean Fleet® technologies.

C.    **Defendant Certarus Signs NDA with USWS**

36.    Founded in 2014, Defendant Certarus (USA) Ltd. is the U.S. operating division of Certarus Ltd., a compressed natural gas ("CNG") delivery and mobile energy distribution service provider based out of Calgary, Alberta, Canada.[2]  On information and belief, both Certarus Ltd. and its U.S. operating division, Defendant Certarus (USA) Ltd., were co-founded by Defendant Nathan Ough.  On further information and belief, Ough acted as the Vice President of Certarus Ltd. and/or its U.S. operating division Certarus (USA) Ltd. from September 2011 to July 2020. *See* Exhibit B, LinkedIn Profile of Nathan Ough.

37.    In early 2019 USWS and Oehring reached out to Defendants Certarus and Ough seeking for Certarus to provide vendor services to fracking sites for which USWS was providing power generation.  USWS wished for Certarus to deliver CNG to well sites being operated by USWS's customers who did not have access to field gas to power the natural gas turbines of USWS's Clean Fleet® system.

38.    To facilitate such business relationship, USWS and Certarus entered into the MCA on or around February 28, 2019, to share non-public, confidential and/or proprietary information relating to USWS's operating information for each well site for which Certarus would provide CNG delivery services.  *See* Exhibit C, Mutual Confidentiality Agreement.  The MCA defined "Confidential Information" as follows:

> "all non-public, confidential or proprietary information disclosed before, on or after the Effective Date, by either Party (a "<u>Disclosing Party</u>") to the other Party (a "<u>Recipient</u>") or its affiliates, or to any of such Recipient's or its affiliates' employees, officers, directors,

---

[2] Certarus Ltd. is not included as a Defendant to this Original Complaint.

partners, shareholders, agents, attorneys, accountants or advisors (collectively, "Representatives"), whether disclosed orally or disclosed or accessed in written, electronic or other form of media, and whether or not marked, designated or otherwise identified "confidential," including, without limitation:

(a)      all information concerning the Disclosing Party's and its affiliates' and their customers', suppliers' and other third parties' past, present and future business affairs including, without limitation, finances, customer information, supplier information, products, services, organizational structure and internal practices, forecasts, sales and other financial results, records and budgets, and business, marketing, development, sales and other commercial strategies;

(b)      the Disclosing Party's unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications and other confidential intellectual property;

(c)      all designs, specifications, documentation, components, source code, object code, images, icons, audiovisual components and objects, schematics, drawings, protocols, processes, and other visual depictions, in whole or in part, of any of the foregoing;

(d)      any third-party confidential information included with, or incorporate in, any information provided by the Disclosing Party to the Recipient or its Representatives; and

(e)      all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations and other materials prepared by or for the Recipient or its Representatives that contain, are based on, or otherwise reflect or are derived from, in whole or in part, any of the foregoing."

*Id.*, § 1 (emphasis in original).  The MCA was signed by Nathan Ough on behalf of Certarus and Jared Oehring on behalf of USWS.  *Id.*, p.7.  The stated "Purpose" of the MCA was for Certarus to "review and develop an economic model for providing third party turbine power generation."

39.      Under the MCA, both USWS and Certarus agreed that each party and its respective representatives and affiliates would hold safe, protect, and abstain from using or further disclosing any of the non-public and confidential information under the MCA without the disclosing party's prior authorization or permission.  Exhibit D, § 3(a)-(d).  USWS and Certarus both agreed that it

12

would be responsible for any breach of the MCA caused by any of its representatives or affiliates. Furthermore, the MCA provided for a two-year term, which expired on February 28, 2021. *Id.*, § 7.

40. Further, under the protection of the MCA, USWS provided "Confidential Information," as defined under the MCA, to Certarus. The information shared by USWS to Certarus included, but was not limited to, information regarding (i) the natural gas connections and electric cable connections between subsystems of USWS's Clean Fleet® system that was being implemented at specific sites of USWS operating sites; (ii) operating conditions of USWS's Clean Fleet® system at said sites, including the fuel consumption and power consumption of the USWS Clean Fleet® natural gas turbines; and (iii) pad layout drawings and aerial drone photographs of USWS's well sites. On information and belief, much of this information was shared verbally between USWS employees, including Oehring to Certarus for the purposes of Certarus providing CNG to these said sites.

**D.    USWS Promotes Oehring to Chief Technical Officer**

41. Within days of signing the MCA with Certarus, Oehring was offered and accepted the position of Chief Technology Officer ("CTO") at USWS. On March 4, 2019, USWS and Defendant Oehring entered into a new Employment Agreement ("2019 Employment Agreement"). *See* Exhibit D, 2019 Employment Agreement. Oehring's promotion to CTO was based on his continued contributions to USWS's Clean Fleet® and his business developments as VP of Technology for USWS.

42. As with his previous employment agreements, Defendant Oehring once again agreed and acknowledge his obligation to protect USWS's "Confidential Information" as CTO. For example, under Section 7 of the 2019 Employment Agreement, Oehring agreed that "during

his employment by [USWS] or thereafter [Oehring] will not, directly or indirectly (without [USWS's] prior written consent), use for himself or use for, or disclose to, any party other than [USWS] or any Affiliate of [USWS], any Confidential Information…." *Id.* § 7, Confidential Information.

43.     Similar to his 2017 Employment Agreement, the 2019 Employment Agreement between Oehring and USWS defined "Confidential Information" as follows:

> "Confidential Information, as hereafter defined, including but not limited to information relating to the following:
>
> (a)     the business or products of or services performed by [USWS] or any of its Affiliates, or
>
> (b)     the costs, uses or applications of, or the customers or suppliers (and information concerning transactions and prospective transactions therewith) for products made, assembled, produced or sold or services performed by [USWS] or any of its Affiliates, or
>
> (c)     any apparatus, method, design, system, manufacturing or other process or technology at any time used, developed or investigated by or for [USWS] or any of its Affiliates, whether or not invented, developed, acquired, discovered or investigated by [Oehring].
>
> As used herein, "Confidential Information" shall include, but shall not be limited to, information, in whatever form kept or recorded, pertaining to: inventions, discoveries, know-how, ideas, computer programs, designs, algorithms, processes and structures; product information; research and development information; customer information; financial information; business processes and methodology; and other technical and business information of [USWS]…and any other technical and business information of [USWS]…which is of a confidential, trade secret and/or proprietary character."

*Id*.[3]  The 2019 Employment Agreement also required that, upon termination, Defendant Oehring return to USWS "all documents and other materials containing any Confidential Information" in his possession.  *Id*.

44.     Furthermore, Oehring agreed that, upon his termination from USWS, Oehring "shall promptly deliver to [USWS] all documents and other materials containing any Confidential Information in physical form…."  *Id*.  Additionally, Oehring agreed and acknowledged that "damages resulting from any breach of the foregoing covenants may be intangible in whole or in part and that [USWS] is entitled to seek specific enforcement, injunctive relief and other equitable remedies for a breach or threatened breach of these provisions in addition to monetary damages and legal remedies, and [Oehring] hereby stipulates to the entering of such injunctive relief enforcing the provisions of [Section 7-Confidential Information]."  *Id*.

45.     As with his 2017 Employment Agreement, Oehring further agreed to assign all of his "Work Product" made or conceived during his employment with USWS to USWS in the 2019 Employment Agreement.  *See id*. § 8(a)-(b).

46.     Finally, Oehring acknowledged that USWS "has spent substantial money, time and effort over the years in developing and solidifying its relationships with its customers and in developing its confidential, proprietary information" and that if Oehring's employment with USWS "were to cease, [USWS] and its Affiliates would need certain protections in order to ensure that [Oehring] does not appropriate and use any Confidential Information entrusted to [Oehring] during the course of [his] employment by USWS."  *Id*. § 9.

---

[3] The 2019 Employment Agreement between USWS and Oehring provides a more expansive definition of "Confidential Information" than his 2017 Employment Agreement.

**E.**   **Defendants Oehring and Ough Begin Misappropriating USWS's Confidential Information Outside the Scope of the MCA**

47.    As mentioned, under the protections of the MCA signed between the parties, USWS provided Certarus with information regarding (i) the natural gas connections between subsystems of USWS's Clean Fleet® system that was being implemented at specific USWS operating sites; (ii) operating conditions of USWS's Clean Fleet® system at said sites, including the fuel consumption and power consumption of the USWS Clean Fleet® natural gas turbines; and (iii) pad layout drawings and aerial drone photographs of USWS's well sites to facilitate Certarus' delivery of CNG to well sites operated by USWS's customers using the Clean Fleet® system and technologies.

48.    With said information protected by the MCA, Certarus has successfully delivered CNG to USWS well sites throughout 2019 and continues to provide CNG services to USWS to this day.  On information and belief, from the February 2019 signing of the MCA between USWS and Certarus, Defendants Oehring and Ough frequently discussed information pertaining to Certarus' delivery of CNG to USWS well sites via text messages.

49.    On information and belief, throughout 2019, Oehring, as the CTO of USWS, provided Ough (and Certarus) with information covered by the signed MCA to facilitate the delivery of CNG to USWS well sites.  Together, Oehring and Ough personally developed a business relationship with one another in their respective roles as CTO of USWS and VP of Certarus.

50.    On information and belief, on or around August 9, 2019, Defendant Ough asked Oehring to have breakfast with him at Tiny Boxwoods in Houston, Texas.  On information and belief, Oehring, who was still the CTO of USWS, attended the breakfast, where Ough proceeded to pitch Oehring the idea of the two of them starting a power generation company.

51.     On information and belief, on or around October 24, 2019, Defendant Ough, began improperly exploiting the legitimate business relationship, as memorialized by the signed MCA, between Certarus and USWS.  On information and belief, Ough, acting as the VP of Certarus, began asking Oehring specific questions via text message regarding the operations of USWS's Clean Fleet® system and technologies that exceeded the scope of the parties' MCA.

52.     For instance, on information and belief, Ough began asking Oehring to provide him with the specific electric cable connections and couplings that USWS used to connect the different components of its Clean Fleet® system.  On information and belief, Oehring, via text message, provided Ough with the requested information.  On further information and belief, the confidential information provided from Oehring to Ough included the specific connections between the power generation components, electric distribution components, and high pressure pumping components of USWS's Clean Fleet® system.  In accordance with Oehring's 2019 Employment Agreement, the shared information constituted confidential and proprietary information that belonged to USWS.  *See* Exhibit D.

53.     On information and belief, likely in connection with Ough's business idea, Ough continued to request additional information from Oehring that exceeded the scope of the MCA signed between USWS and Certarus from October 2019 through May 2020.  During this time, on information and belief, Ough began using USWS's confidential and proprietary information (that exceeded the scope of the signed MCA) to begin developing his business idea.

F.     **Ough and Oehring Develop Their Startup Company**

54.     On information and belief, in June 2020, Oehring and Ough, still acting in their respective roles as CTO of USWS and VP of Certarus, respectively, began to develop the business model for the startup power generation company.

55.    On information and belief, on or around June 4, 2020, Ough began asking Oehring for additional confidential information regarding specific operating conditions of USWS's Clean Fleet® system and technologies to use in the development of his business model for the power generation company Ough had pitched on August 9, 2019.   On information and belief, Ough requested information from Oehring regarding the power output levels and voltage levels utilized by USWS's Clean Fleet® system, along with cost and supply chain information associated with the development of the power generation components of USWS's Clean Fleet® system.   On further information and belief, Oehring provided such information to Ough for use in the business model for the startup power generation company (hereinafter referred to as "VoltaGrid").

56.    On information and belief, Ough, now equipped with the confidential electrical and power consumption information regarding USWS's Clean Fleet® system, developed a business model for VoltaGrid.   On information and belief, Ough additionally used Certarus' own operating and cost information, which he necessarily had access to as the VP of Certarus, to generate his business model for what later became VoltaGrid.   On information and belief, around June 2020, Ough and Oehring began laying the groundwork to pitch their newly developed VoltaGrid business model to investors.

57.    On information and belief, on or around June 4, 2020, Ough sent detailed proposal drawings of the power generation systems to be used by VoltaGrid.   On information and belief, these drawings were prepared by CAT® engineering services.   On information and belief, Ough also instructed Oehring to only communicate using Ough's personal email address, as opposed to his Certarus email address.

58.    On information and belief, on or around June 5, 2020, Ough asked Oehring to run sensitivities on the VoltaGrid business model developed by Ough using the confidential USWS

(and Certarus) business and technical information.  On further information and belief, Oehring provided Ough with additional pricing and operating data, as well as his general project management know-how regarding the Clean Fleet® systems, to Ough in connection with the VoltaGrid business model.

59.     On information and belief, on or around June 7, 2020, Oehring began to meet with potential suppliers to develop the VoltaGrid power generation units.  For instance, on information and belief, on or around June 7, 2020, Oehring met with Grizzly to discuss Grizzly building VoltaGrid's generator sets.  On further information and belief, on or around the same time as Oehring's meeting with Grizzly, Oehring met with Stewart & Stevenson to discuss building VoltaGrid's generator sets.

60.     On information and belief, on or around June 9, 2020, Oehring and Ough met with principles from Walter Ventures and NexTier Energy to pitch investment opportunities in VoltaGrid.  On information and belief, Ough and Oehring met with: Robert Drummond, President & CEO of NexTier; Kevin McDonald, Executive VP, Chief Administrative Officer, and General Counsel of NexTier; and Stephen Luke at this meeting.  On information and belief, around the June 9, 2020 meeting, Walter Ventures agreed to invest in VoltaGrid.

61.     On further information and belief, after Oehring and Ough's investment pitch meeting on June 9, 2020, Ough asked Oehring to conduct further due diligence on the VoltaGrid pricing model.  On information and belief, Oehring used his unfettered access as the CTO of USWS to access and share power load information pertaining to the Clean Fleet® system, along with specific operating and technical information from multiple USWS operating well sites.  Additionally, Oehring provided Ough with financial and pricing information between USWS and its customers.

62.     On information and belief, on or around June 8, 2020, Ough asked Oehring if he would be available to pitch VoltaGrid's electric power generation services to Halliburton.  On further information and belief, on or around June 12, 2020, Ough met with Halliburton to discuss a business relationship between VoltaGrid and Halliburton pertaining to electric power generation services for electric fracking operations, along with battery and storage services related to electric fracturing operations.  On information and belief, on or around June 20, 2020, Halliburton asked Ough, via email, a number of specific operating and technical questions regarding the proposed VoltaGrid power generation and energy storage systems.  On information and belief, Ough forwarded these questions to Oehring, who answered the questions using confidential and proprietary information related to USWS's Clean Fleet® system and technologies.

63.     Furthermore, at the time of Halliburton's questions to Ough, USWS was in the process of developing its own battery and energy storage systems.  On information and belief, Oehring provided non-public, confidential, and proprietary information to Ough and Halliburton relating to USWS's developments of its battery and energy storage systems.

64.     On information and belief, on or around June 29, 2020, Halliburton relayed a number of questions and concerns regarding VoltaGrid's generator layout to Ough and Oehring. On information and relief, Oehring provided additional confidential and proprietary information belonging to USWS to Ough and Halliburton in relation to their concerns and questions.

65.     On information and belief, as a condition of his employment with Certarus, Ough agreed that any business development ideas he created in his role as the VP of Certarus would be the property of Certarus.  Accordingly, on information and belief, on or around July 10, 2020, Ough presented the business idea and services of VoltaGrid, which he developed while has the VP of Certarus (and notably, created with information known to and available to Certarus, such as

confidential USWS information provided under the MCA), to the Certarus Board of Directors. On further information and belief, Certarus approved of Ough's VoltaGrid proposal, and agreed to allow him to spin-off VoltaGrid from Certarus. On further information and belief, the members of the Certarus Board of Directors, in their individual capacities, agreed to invest millions of dollars into VoltaGrid. On further information and belief, on or around the July 2020 pitch meeting with Certarus, Ough agreed to resign in his role as VP of Certarus to pursue the "business idea" of VoltaGrid.

66.    On information and belief, on or around July 13, 2020, Ough met with Halliburton to further discuss energy storage systems. On information and belief, Ough provided USWS's confidential and proprietary information that he had acquired from Oehring regarding said energy storage systems to Halliburton. On further information and belief, now financially backed by Certarus, Ough and Oehring began to pitch VoltaGrid's power generation and energy storage services to customers in the fracking industry. As it would turn out, several of these customers were also USWS's customers.

67.    On information and belief, on or around July 24, 2020, Ough instructed Oehring to "not leave any breadcrumbs" as it related to Oehring's production of USWS's information to Ough/VoltaGrid. On further information and belief, on or around July 30, 2020, Ough instructed Oehring to no longer email Ough at his Certarus email, likely in connection with Ough leaving Certarus to work full-time at VoltaGrid.

G.    **USWS Discovers Ough and Oehring's Startup Company**

68.    Accordingly, on or around the beginning of September 2020, USWS was informed by one of its customers that Oehring was pitching business and investment opportunities relating to VoltaGrid.

69.     Accordingly, on or around September 13, 2020, Oehring was advised during a phone conversation with the upper-level management of USWS that he had committed actions that were grounds for termination of his employment with USWS "for cause" within the meaning of his 2019 Employment Agreement.  *See* Exhibit D, 2019 Employment Agreement, § 5(b), (d). Specifically, Oehring was notified that his actions regarding his promotion of VoltaGrid while acting as a representative of USWS was a direct violation of the 2019 Employment Agreement and USWS's Code of Conduct.

70.     Rather than being terminated for cause, Oehring immediately offered to voluntarily resign as CTO from USWS.  USWS agreed to accept Oehring's resignation, which was tendered to USWS on September 13, 2020.

71.     The next day, Oehring and USWS signed a Separation Agreement and General Release ("Separation Agreement").  *See* Exhibit E, Separation Agreement and General Release. In addition to setting out the financial terms of Oehring's resignation, Oehring agreed and acknowledged that "he is bound by all of the provisions in Section 7 of the [2019] Employment Agreement entitled, 'Confidential Information' and Section 8 entitled 'Inventions, etc.'"  *Id*. § 9. Oehring further agreed and acknowledged that "his obligations under those Sections continue even after the Termination Date."  *Id*.

72.     The Separation Agreement further provides that Oehring agreed to "immediately return to [USWS] all [USWS] property, including but not limited to [USWS] equipment, tools, technical materials, client/vendor lists, marketing information, pricing information, cellular phones, credit cards, personnel materials or files, handbooks, manuals, policies, memoranda, notes, and drafts thereof, and any other documents or property obtained by [Oehring] or on [Oehring's] behalf, directly or indirectly, pursuant to [Oehring's] employment with [USWS]."  *Id*. § 11.

22

73.     The Separation Agreement further provides that USWS "voluntarily releases and forever discharges Oehring of and from any claims known by senior management of [USWS] as of the date of execution of this Agreement which claims arise from or relate in any way to (1) Oehring's employment with [USWS] and (2) Oehring's separation from employment with [USWS]." *Id*. § 13.  However, the Separation Agreement states that "the foregoing release in this paragraph does not apply to any claims that are not known by senior management of [USWS]." *Id*.  Additionally, the Separation Agreement further states that "the release in this paragraph does not apply to [USWS's] claims for breach of the [2019] Employment Agreement's provisions contained in Sections 7 [Confidential Information], 8 [Inventions, etc.] & 9 [Non-Compete] [of the 2019 Employment Agreement]…." *Id*.

74.     Finally, at the request of Oehring, USWS agreed to make one exception to Oehring's continued obligations under Sections 8 and 9 of the 2019 Employment Agreement as described in the Separation Agreement as it pertained to Oehring's employment after his resignation from USWS.  Such exception permitted Oehring to advance and continue his efforts to grow VoltaGrid that he had been terminated for promoting while acting as CTO of USWS.  To such end, USWS exempted Oehring's employment (and ownership) with NexGrid Technologies LLC[4] (and any applicable successor companies) from the terms of the Separation Agreement.

---

[4] During the time leading up to Oehring's separation from USWS, "VoltaGrid" was not yet in existence.  Rather, the company being promoted by Ough and Oehring was formed as NexGrid Technologies LLC ("NexGrid").  Defendant Ough co-founded NexGrid Technologies LLC as a Texas limited liability company on July 20, 2020.  *See* Exhibit F, Certificate of Formation (NexGrid Technologies LLC).  On October 29, 2020, a month after Oehring's separation from USWS, Ough, who was the founder of NexGrid, changed the entity's name to VoltaGrid LLC. *See* Exhibit F, NexGrid Technologies LLC Certificate of Amendment.  Accordingly, for the purposes of this Complaint, "VoltaGrid" and "NexGrid" are used interchangeably; and both are intended to be in referenced to Defendant VoltaGrid LLC.

75.     However, on information and belief, Oehring had represented to USWS that NexGrid/VoltaGrid was a "power generation company and creates power generation equipment," and that it was engaged in mining and power generation opportunities in California.  Based on USWS's understanding, NexGrid/VoltaGrid would not be in direct competition with USWS or its Clean Fleet® technologies.  On further information and belief, Oehring did not disclose the nature of NexGrid/VoltaGrid, including the fact that it was partially funded by Certarus, who was still delivering CNG to USWS well sites in connection with their original business agreement, the fact that it was being operated by Ough, or the fact that Oehring had shared confidential and proprietary information belonging to USWS with Ough to help develop the VoltaGrid business plan and proposed services.

76.     Based on USWS's understanding of the situation, and the purported non-competitive nature of NexGrid/VoltaGrid, USWS granted Oehring the exemption from his covenant not to compete with USWS post-resignation.  However, upon his resignation, Oehring was still bound by the confidentiality obligations of his 2019 Employment Agreement as it pertained to USWS's "Confidential Information."

## H.     Defendants Ough and Oehring Build VoltaGrid into a USWS Competitor with USWS's Confidential Information

77.     After executing his Separation Agreement with USWS on September 14, 2020, Oehring joined VoltaGrid as the Chief Technology Officer on a full time basis.  *See* Exhibit H, Jared Oehring "Resume."  After his separation from USWS, on information and belief, VoltaGrid, Ough, and Oehring continued develop products, systems, and services, which would compete with USWS's Clean Fleet® in the electric hydraulic fracturing market, including natural gas powered generation systems and battery and energy storage systems.  On information and belief, VoltaGrid's natural gas powered generation systems and battery and energy storage systems were

originally conceived and developed using the confidential operating information provided to Ough/VoltaGrid by Oehring.

78.     On information and belief, at some point after Oehring's separation from USWS, VoltaGrid purchased the "business idea/plan" that was developed by Ough and Oehring from Certarus for $25,000.00.  On information and belief, Oehring wired the $25,000.00 on behalf of VoltaGrid to Certarus for the purchase of the "business idea/plan" for VoltaGrid.

79.     However, to further build VoltaGrid into a true competitor to USWS, Oehring, as the new CTO of VoltaGrid, needed to build the supply chain and development capabilities to actually sell and deploy the VoltaGrid power generation and battery/energy storage services, products, and systems.  Accordingly, on information and belief, Oehring and VoltaGrid hired several former USWS employees who had worked on the Clean Fleet® systems to build up the knowledge base at VoltaGrid.  Moreover, on information and belief, Oehring used his prior knowledge of USWS's supply chain, technical/engineering designs and designers, manufacturers, and vendors to develop the supply chain, manufacturing operations, and engineering design of the products and services at VoltaGrid, including VoltaGrid's power generation products and battery/energy storage services.  Oehring (and thus VoltaGrid and its employees) used Oehring's experience, knowledge, and prior business relationships to get a head start on developing competing products and services related to electric fracturing technologies.

80.     Further, on information and belief, Oehring used his extensive knowledge of USWS's customer base, pricing information, and operating costs to develop business and services pitches to current USWS customers in an attempt to steal away power generation and energy storage opportunities from USWS.

I.      **VoltaGrid's Operations Today**

81.     Today, VoltaGrid offers a number of "Modular Power Solution Components" as "turnkey power solutions."    *See* Exhibit I, VoltaGrid Technology, available at: https://voltagrid.com/technology/ (last accessed October 1, 2021).



82.     On information and belief, VoltaGrid developed one or more of its "Modular Power Solution Components" using USWS's confidential and proprietary information provided by Oehring to Certarus, Ough, and, eventually, VoltaGrid.    On information and belief, this confidential and proprietary information was improperly obtained and accessed by (i) Ough, through his employment with Certarus; (ii) Oehring through his employment with USWS; and (iii) Ough and Oehring, through their improper and unauthorized communications with one another regarding information that was beyond the business relationship of USWS and Certarus.

83.     On information and belief, Defendants Ough, VoltaGrid, and its representatives Oehring and Ough have used, and are continuing to use, USWS's confidential and proprietary information that was improperly obtained through Certarus, Ough, and/or Oehring to develop systems, products, and components to accompany and service electric hydraulic fracturing operations and projects.    On information and belief, VoltaGrid and its representatives are using

products and services, which necessarily incorporates USWS's confidential and proprietary information, to compete with and take business from USWS.

### COUNT I: VIOLATION OF THE DEFEND TRADE SECRETS ACT (AGAINST ALL DEFENDANTS)

84.    USWS incorporates herein each of the paragraphs above by reference.

85.    The USWS Confidential and Trade Secret Information includes, but is not limited to (i) information regarding the natural gas connections and electric cable connections between subsystems of USWS's Clean Fleet® system that was being implemented at specific USWS operating sites; (ii) operating conditions of USWS's Clean Fleet® system at said sites, including the fuel consumption and power consumption of the USWS Clean Fleet® natural gas turbines; (iii) pad layout drawings and aerial drone photographs of USWS's well sites; (iv) information pertaining to the business or products of or services performed by USWS; (v) information pertaining to USWS's customers or suppliers, including the information concerning the transactions and prospective transactions therewith for products and services provided by USWS; (vi) information pertaining to USWS's Clean Fleet® technology that is non-public and not the subject of a patent or any utilitarian intellectual property protection, including, for instance, information pertaining to USWS's battery and energy storage products and services; and (vii) USWS's financial information, business processes, product information and research and development information.

86.    All of this USWS Confidential and Trade Secret Information constitutes trade secrets as defined in the Defend Trade Secrets Act, 18 U.S.C. § 1839(3).

87.    The USWS Confidential and Trade Secret Information provides USWS with a competitive and commercial advantage and has independent economic value from not being known or readily ascertainable by others who can obtain economic value from use.  For example,

USWS's Confidential and Trade Secret Information pertains to its Clean Fleet® systems and technologies, which offers competitive advantages over competing products and services in the hydraulic fracturing industry, generally.

88.    Based on the foregoing facts, Defendants unlawfully misappropriated the USWS Confidential and Trade Secret Information and used those trade secrets in interstate commerce.

89.    USWS has taken reasonable measures to maintain the secrecy of the USWS Confidential and Trade Secret Information.  Those measures include, among other things, use of employment agreements, codes of conduct, and robust confidential provisions acknowledged and agreed to by USWS's employees, its business partners, and any other recipient who obtains or access any of USWS's Confidential and Trade Secret Information.

90.    Due to these measures, USWS's Confidential and Trade Secret Information is not generally known or readily ascertainable through proper means.

91.    Defendants' misappropriation of USWS's Confidential and Trade Secret Information was intentional, knowing, willful, malicious, fraudulent, and undertaken with a conscious disregard for USWS's legal and contractual rights.

92.    Unless Defendants are enjoined from further disclosing and utilizing USWS's Confidential and Trade Secret Information, USWS will continue to be immediately and irreparably harmed because VoltaGrid, a competitor, will have obtained, will continue to obtain, and will have use of USWS's Confidential and Trade Secret Information that is not generally known to the public.  Moreover, there is a real threat of further use and disclosure of the USWS's Confidential and Trade Secret Information absent injunctive relief from this Court.

93.    As a direct and proximate result of Defendants' Disclosure and misuse of USWS's Confidential and Trade Secret Information, USWS has suffered, and will continue to suffer,

substantial loss and damages.  Additionally, USWS has suffered, and will continue to suffer, irreparable harm and an ongoing threat of irreparable harm for which USWS has no adequate remedy at law, as a result of Defendants' actual or threatened misappropriation.  Because USWS's remedy at law is inadequate, USWS seeks, in addition to damages, injunctive relief to recover and protect USWS's Confidential and Trade Secret Information.  Moreover, Oehring has acknowledge and agreed in his prior employment agreements and Separation Agreement that USWS will suffer irreparable harm and that injunctive relief is appropriate for any misuse or disclosure of USWS "Confidential Information," as defined by those agreements.  As such, Oehring is estopped to deny this irreparable harm.

94.     In addition to the irreparable harm described, USWS has a substantial likelihood of success on this claim; the harm, if any, to Defendants should injunctive relief be granted to restore the status quo ante, would be far outweighed by the harm to USWS absent such relief, and the public interest and effect on innocent third-parties favors such relief.  Balancing such factors, USWS is entitled to the remedy of a provisional restraining order and injunctive relief, as well as permanent injunctive relief as prayed for below.

95.     As a further and direct result of Defendants' misconduct, USWS is entitled to an award of damages, including lost revenues, minus direct costs, and Defendants' unjust enrichment. The amount of this award will be proved at trial, but is reasonably believed to exceed $1 million.

## COUNT II: VIOLATION OF TEXAS UNIFORM TRADE SECRETS ACT
## (AGAINST ALL DEFENDANTS)

96.     USWS incorporates herein each of the paragraphs above by reference.

97.     USWS's Confidential and Trade Secret Information is valuable and critical to USWS's business operations.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(6).  USWS derives economic value and a competitive advantage from its confidential information not being

generally known to, or readily ascertainable by proper means by, other persons who can receive economic value from their disclosure.

98.    The Texas Uniform Trade Secrets Act ("TUTSA") protects a company's trade secrets against actual or threatened misappropriation and provides that actual or threatened misappropriation may be enjoined and that damages may be awarded.

99.    The USWS Confidential and Trade Secret Information meets the definition of a "Trade Secret" under TUTSA § 134A.002(6).

100.    Defendants' conduct constitutes actual or threatened misappropriation, misuse, or inevitable reliance upon USWS's Confidential and Trade Secret Information and violates TUTSA.

101.    Oehring provided Defendants access to USWS's Confidential Information both during and after Oehring's employment with USWS.  Defendants Ough, Certarus, Oehring and VoltaGrid are now in a position to use or further disclose USWS's Confidential and Trade Secret Information for a purpose adverse to USWS's business interests.  Moreover, Ough, in his capacity as a Vice President at Certarus, improperly accessed USWS's Confidential and Trade Secret Information in a way that exceeded the scope of the Purpose of the Mutual Confidentiality Agreement signed by USWS and Certarus.  Ough then used this information to develop his business model and plan for VoltaGrid, along with additional Confidential and Trade Secret Information that was provided to Ough by Oehring.

102.    Defendants have all disclosed and will inevitably further disclose USWS's Confidential and Trade Secret Information.

103.    Defendants have encouraged Oehring to disclose USWS's Confidential and Trade Secret Information for the benefit of Defendants' business interests and to the detriment of USWS. Further, Defendants have, individually and/or collectively, disclosed or used USWS's Confidential

and Trade Secret Information without express or implied consent of USWS, and Defendants knew or had reason to know that Oehring had derived this information through improper means.

104.    USWS has taken reasonable measures to maintain the secrecy of the USWS Confidential and Trade Secret Information as set forth above.  Due to these measures, USWS's Confidential and Trade Secret Information is not generally known or readily ascertainable through proper means.

105.    Unless Defendants are enjoined from disclosing and utilizing USWS's confidential, proprietary, and trade secret information, USWS will continue to be immediately and irreparably harmed because VoltaGrid, its competitor, has obtained, will continue to obtain, and has use of USWS's information that is not generally known to the public.  Moreover, there is a real threat of further use and disclosure of the USWS Confidential and Trade Secret Information absent injunctive relief from this Court.

106.    Defendants' actual or threatened misappropriation of USWS's trade secrets and confidential and proprietary information is and was willful and malicious, as illustrated in part by the timing of their taking of USWS's competitive information—while Oehring was still working at USWS and after Oehring's departure from USWS.

107.    As a direct and proximate result of Defendants' disclosure and misuse of USWS's Confidential and Trade Secret Information, USWS has suffered, and will continue to suffer, substantial loss and damages.  Additionally, USWS has suffered, and will continue to suffer, irreparable harm and an ongoing threat of irreparable harm for which USWS has no adequate remedy at law, as a result of Defendants' actual or threatened misappropriation.  Because USWS's remedy at law is inadequate, USWS seeks, in addition to damages, injunctive relief to recover and protect USWS's Confidential and Trade Secret Information.  Oehring has acknowledge and agreed

in his 2019 Employment Agreement and his Separation Agreement that USWS will or would suffer irreparable harm and that injunctive relief is appropriate for the misuse and disclosure of USWS Confidential and Trade Secret Information.  Accordingly, Defendant Oehring is estopped to deny that USWS has or will suffer irreparable harm or that injunctive relief is appropriate. Further, TUTSA permits injunctive relief to issue to enjoin "[a]actual or threatened misappropriation."  Tex. Civ. Prac. & Rem. Code Ann. § 134A.003(a).  Additionally, injunctive relief may include affirmative acts to protect a trade secret.  *Id*. at § 134A.003(c).

108.    In addition to the irreparable harm described, USWS has a substantial likelihood of success on this claims; the harm, if any to Defendants should provisional injunctive relief be granted to restore the status quo ante would be far outweighed by the harm to USWS if no such relief were granted.  Further, the public interest, and effect on innocent third-parties favors such relief.  Balancing such factors, USWS is entitled to the remedy of a provisional restraining order and injunctive relief, as well as permanent injunctive relief as prayed for below.

109.    As a further and direct result of Defendants' misconduct, USWS is entitled to an award of damages, including USWS's lost revenues, minus direct costs, and/or Defendants' unjust enrichment.  The amount of this award will be proved at trial, but is reasonably believed to exceed $1 million.

110.    USWS further seeks exemplary damages for the intentional, willful and malicious conduct set forth above by Defendants undertaken with the knowledge that their actions would cause real and significant injury to USWS.  This willful and reprehensible conduct be Defendants taken in reckless disregard for the legal rights of USWS entitles USWS to an additional amount two times its damages to be determined at trial, pursuant to Tex. Civ. Prac. & Rem Code. Ann.

§ 134A.004(b).  For the same reasons, USWS is also entitled to an award of attorney fees.  *Id*. at § 134A.0005.

**COUNT III: BREACH OF CONTRACT**
**(AGAINST DEFENDANT OEHRING)**

111.    USWS incorporates herein each of the paragraphs above by reference.

112.    As described more fully above, USWS and Defendant Oehring are parties to the 2019 Employment Agreement dated March 4, 2019 and the Separation Agreement dated September 14, 2020.

113.    Under the terms of both the 2019 Employment Agreement and the Separation Agreement, Defendant Oehring agreed to hold all USWS Confidential Information in trust and confidence, both during and after the term of the Employment Agreement and not to use or disclose the USWS Confidential Information for the benefit of any third party.

114.    Defendant Oehring also agreed, following the termination of his employment, to promptly return to USWS: (i) all USWS Confidential Information; (ii) all documents and other materials containing any Confidential Information; and (iii) all other property of USWS. Defendant Oehring acknowledge that all of this information at all times was the property of USWS.

115.    As a direct and proximate result of Oehring's failure to perform his obligations under his Employment Agreement, USWS has suffered irreparable harm that cannot be fully compensated by money damages.  This irreparable injury will continue unless Oehring is enjoined from further violation of his Employment Agreement to protect USWS Confidential Information and to return USWS Confidential Information still in his possession.

116.    Oehring agreed in his 2019 Employment Agreement and Separation Agreement that USWS would be irreparably harmed for his failure to fulfill the promise to refrain from misusing or disclosing USWS Confidential Information.  As such, Oehring are estopped from

contesting that USWS should be entitled to an injunction to prevent him from disclosing or using USWS Confidential Information.

**COUNT IV: BREACH OF CONTRACT**
**(AGAINST DEFENDANT CERTARUS (USA) LTD.)**

117.    USWS incorporates herein each of the paragraphs above by reference.

118.    As described more fully above, USWS and Defendant Certarus were parties to the Mutual Confidentiality Agreement dated February 28, 2019.  *See* Exhibit D, MCA.

119.    Under the terms of the MCA, Defendant Certarus agreed to: (i) protect and safeguard the confidentiality of all such Confidential Information; (ii) not use USWS's Confidential Information, or permit it to be accessed or used, for any purpose other than the "Purpose" of the MCA or any related transactions between USWS and Certarus; and (iii) not disclose any such Confidential Information to any person or entity other than those enumerated in the MCA.  Defendant Certarus further agreed that it would be responsible for any breach of the MCA caused by any of its "Representatives."

120.    As described more fully above, Defendant Certarus failed to protect and safeguard the confidential of USWS's Confidential Information by, for example but not limited to, allowing its Vice President, Defendant Nathan Ough, to improperly access and use said Confidential information for developing the business model of Defendant VoltaGrid, by which exceeded the "Purpose" of the MCA.  Pursuant to its employment agreement Ough, Certarus thus owned the "VoltaGrid" business model, which necessarily relied on USWS's Confidential Information as defined by the MCA.

121.    Further, Certarus sold, without USWS's permission or authorization, USWS's Confidential Information to Defendant VoltaGrid in direct and clear violation of the obligations and terms of the MCA signed by Certarus and USWS on February 28, 2019 by selling the

"VoltaGrid business plan" to VoltaGrid. Such a sale resulted in the disclosure of USWS's Confidential Information to persons and entity other than those enumerated in the MCA. Moreover, Certarus allowed Ough, its representative, to breach its obligations of the MCA by improperly accessing and using USWS's Confidential Information.

122.     As a direct and proximate result of Certarus' failure to perform its obligations under the MCA, USWS has suffered irreparable harm that cannot be fully compensated by money damages. This irreparable injury will continue unless Defendants Certarus is enjoined from further violation to protect USWS's Confidential Information and to return USWS Confidential Information still in its possession.

**COUNT V: TORTIOUS INTERFERENCE WITH A CONTRACT**
**(AGAINST DEFENDANTS CERTARUS, VOLTAGRID, AND OUGH)**

123.     USWS incorporates herein each of the paragraphs above by reference.

124.     USWS's 2019 Employment Agreement and Separation Agreement with Defendant Oehring are enforceable contracts, and the restrictive covenants therein are also enforceable.

125.     Defendants Ough, VoltaGrid and Certarus knew about the existence of these agreements.

126.     Defendants Ough, VoltaGrid and Certarus tortuously and unjustifiably interfered with these agreements be encouraging, inducing, and proximately causing Defendant Oehring to breach the restrictive covenants within these agreements.

127.     USWS has incurred actual damage or loss by losing employees with confidential information to a competitor and subsequently losing business in the electric fracturing industry. The amount of damages will be proven at trial is reasonably believed to exceed $1 million.

128.     USWS seeks exemplary damages for the intentional, willful and malicious conduct set forth above by Defendants Ough, VoltaGrid and Certarus with knowledge that its action would

cause real and significant injury to USWS. This willful and reprehensible misconduct by Defendants Ough, VoltaGrid and Certarus, taken in reckless disregard for the legal rights of USWS, entitles USWS to an additional award in excess of its actual damages pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 41.001 et seq. On this same basis, USWS is entitled to an award of its attorney fees.

## COUNT VI: CIVIL CONSPIRACY
## (AGAINST ALL DEFENDANTS)

129.    USWS incorporates herein each of the paragraphs above by reference.

130.    Defendants are a combination of two or more persons.

131.    Defendants sought, through a meeting of the minds, to accomplish a lawful purpose through unlawful acts, including, but not limited to, disclosing and misappropriating USWS's confidential and trade secret information belonging to USWS, fraudulently inducing USWS to enter into the 2020 Separation Agreement, causing Oehring to breach his fiduciary duties and breaching his 2019 Employment Agreement, usurping USWS's business opportunities, and diverting profits to USWS.

132.    Specifically, for instance, Defendants Ough, Oehring, and VoltaGrid together, knowingly and intentionally misappropriated USWS's confidential and trade secret information to develop the business model, company, and products and services for VoltaGrid.

133.    Defendants Oehring and Ough, together, received the fruits of such misappropriation: Oehring was promised an opportunity to own part of VoltaGrid, along with a salary and starting bonus after leaving USWS. Ough, as the "creator" of VoltaGrid, received material assistance toward the development of VoltaGrid by his former employer, Certarus, along with the material assistance of other investors. Moreover, Ough, as an executive of VoltaGrid, received financial compensation for his business dealings at VoltaGrid.

134. Accordingly, it is a reasonable inference that, in light of their joint participation in the development of VoltaGrid and their enjoyment of the fruits of the misappropriation, Defendants Ough, Oehring, and VoltaGrid had a meeting of the minds on an object or course of action, namely, to wrongfully misappropriate USWS's trade secret and confidential information in order to form a competing company in the electric hydraulic fracturing industry and to jointly profit therefrom.

135. As a result of the conspiracy, USWS has suffered damages as a direct, proximate result of Defendants' actions.

136. Accordingly, for civil conspiracy by Defendants Ough, Oehring, and VoltaGrid, USWS is entitled to damages caused by the conspiracy in an amount to be proven at trial.

137. Because the harm to USWS resulted from malice on the part of Ough, from the malice on the part of VoltaGrid, and/or malice attributable to Oehring, USWS is also entitled to punitive damages in an amount to be proven at trial

## COUNT VII: UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

138. USWS incorporates herein each of the paragraphs above by reference.

139. Defendants wrongly secured benefits from USWS by misappropriation of their trade secrets, diverting profits from USWS, and the taking of an undue advantage.

140. For example, Defendants VoltaGrid, Ough, and Oehring have received unjust financial enrichment from their misappropriation of trade secrets by successfully selling and providing products and services that necessarily incorporate USWS's confidential and trade secret information. Furthermore, Defendant Certarus has received unjust financial enrichment from their misappropriation of trade secrets and breach of the MCA with USWS by selling the "VoltaGrid"

business model/plan to VoltaGrid that was developed with USWS's trade secret and confidential information.

141.    The benefits would be unconscionable to retain.  Defendants' unjust enrichment caused USWS injury for which they seek restitution and damages.  Accordingly, Defendants have been unjustly enriched through the unlawful conduct described above.  Any income or revenue Defendants or any person or entity acting in concert with Defendants as a result of their unlawful conduct should be placed in constructive trust and paid to USWS.

## SPOLIATION OF EVIDENCE
## (AGAINST OEHRING, OUGH, AND VOLTAGRID)

142.    USWS incorporates herein each of the paragraphs above by reference.

143.    Defendants Ough, Oehring, and VoltaGrid have a duty to preserve relevant evidence, including relevant electronically stored information ("ESI").  As set forth above, and among other things, at the behest of Nathan Ough, Jared Oehring deleted files relevant to the claims in this lawsuit after being informed of potential claims related to those files as it relates to Oehring's prior engagement with USWS and its discovery of Oehring's misappropriation of its confidential and trade secret information and competitive use of such information at VoltaGrid.

144.    USWS therefore provides notice that it will seek all available remedies for spoliation of evidence that may be revealed through discovery, including an adverse inference instruction to the jury, if appropriate.

## CONDITIONS PRECEDENT

145.    All conditions precedent necessary have been performed or have occurred to entitle USWS to the relief it seeks.

## JURY DEMAND

146.    USWS demands a trial by jury for all issues so triable and has tendered the appropriate fee.

## PRAYER FOR RELIEF

147.    Based on the foregoing allegations, USWS prays that the Court enter judgment in USWS's favor on its claims against Defendants VoltaGrid LLC, Certarus (USA), Ltd., Nathan Ough, and Jared Oehring and award USWS the following remedies against each Defendant, respectively:

A.   actual damages;

B.   exemplary or punitive damages;

C.   that Defendants misappropriated USWS's Confidential and Trade Secret Information;

D.   that Defendant Oehring has breached his 2020 Separation Agreement with USWS;

E.   that Defendant Certarus (USA) Ltd. breached its MCA with USWS;

F.   that Defendants Ough and VoltaGrid tortuously interfered with the contract between USWS and Defendant Oehring;

G.   that Defendants Ough, Oehring, and VoltaGrid engaged in a civil conspiracy;

H.   reasonable attorney fees for Defendant Oehring's breach of contract

I.   prejudgment and post-judgment interest as permitted by law;

J.   costs; and

K.   any other legal or equitable relief that USWS may be entitled to recover, including injunctive relief.

Dated:  October 19, 2021

Respectfully submitted,

By: /s/ *John A. Yates*

John A. Yates
Texas State Bar No. 24056569
SDTX Fed. ID No. 1086753
jyates@pattersonsheridan.com

B. Todd Patterson
Texas State Bar No. 00789537
SDTX Fed. ID No. 17583
tpatterson@pattersonsheridan.com

Kyrie K. Cameron
Texas State Bar No. 24097450
SDTX Fed. ID No. 3528921
kcameron@pattersonsheridan.com

Edgar N. Gonzalez
Texas State Bar No. 24092431
S.D. Tex. Fed. ID No. 3607002
egonzalez@pattersonsheridan.com

Joshua Hain Park
Texas State Bar. No. 24121766
SDTX Fed. ID No. 3653542
jpark@pattersonsheridan.com

**PATTERSON + SHERIDAN LLP**
24 Greenway Plaza, Suite 1600
Houston, Texas 77046
(Tel): 713-623-4844
(Fax): 713-623-4846

*Attorneys for Plaintiff,*
*U.S. Well Services, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically through the Court's electronic filing system on October 19, 2021.

*/s/ John A. Yates*
John A. Yates